IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **ROBERT LEE MORRISON,**<br><br>Plaintiff,<br><br>v.<br><br>**ZIMMER BIOMET HOLDINGS, INC.; BIOMET, INC.; BIOMET MANUFACTURING, LLC; and LBV ACQUISITION, INC.,**<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. **3:24-CV-1003-L** |

**MEMORANDUM OPINION AND ORDER**

Before the court is Defendants' Motion for Judgment on the Pleadings ("Motion") (Doc. 18), filed May 16, 2025; and Plaintiff's Motion for Leave to File Surreply (Doc. 25), which was filed by Plaintiff Morrison Lee Robert ("Plaintiff" or "Mr. Morrison") on August 14, 2025, and is opposed by Defendants Zimmer Biomet Holdings, Inc.; Biomet, Inc.; Biomet Manufacturing, LLC; and LBV Acquisition, Inc. (collectively, "Defendants" or "Biomet"). For the reasons herein explained, Defendants' Motion is **denied** with respect to Defendants' statute of repose, causation, and reliance arguments that are directed at Plaintiff's failure to warn, misrepresentation, and fraud claims, the resolution of which are better suited for summary judgment motion practice or trial; and **denied without prejudice** with respect to Defendants' remaining arguments under Rule 9(b), as the court determines that Plaintiff should be allowed to amend his pleadings with respect to his fraud claim. In light of the court's rulings on Defendants' Motion, the court **denies as moot** Plaintiff's Motion for Leave to File Surreply (Doc. 25).

## I. Background

Mr. Morrison brought this products liability action against Defendants on April 24, 2024, alleging that the metal-on-metal ("MoM") Hip Implant System implanted in both of his hips is defective for a number of reasons and, unbeknownst to him, subjected him to metal poisoning (metallosis) between the time the devices were implanted in 2005 and 2006 and the time he discovered the metal poisoning and corresponding damage caused by the metal poisoning (accumulation of fluids causing soft tissue and bone near his hips to die) in August 2022. Plaintiff alleges that, as a result, he has suffered from significant pain, has had to undergo multiple complex and risky revision hip implant surgeries, and dislocated his hip in December 2022 after the most recent revision surgery. In this regard, Plaintiff alleged in his First Amended Complaint:

> 52. On April 18, 2005, Plaintiff Robert Morrison underwent a surgical procedure to implant the Hip Implant System in Plaintiff's right hip by Oscar David Taunton, Jr., M.D. at Texas Health Harris Methodist HEB in Bedford, Texas.
>
> 53. On April 22, 2005, Plaintiff started receiving physical therapy and rehabilitation services through Gentiva Health Services in Irving, Texas.
>
> 54. On March 6, 2006, Plaintiff Robert Morrison underwent a surgical procedure to implant the Hip Implant System in Plaintiff's left hip by Oscar David Taunton, Jr., M.D. at Southwest Surgical Hospital in Hurst, Texas.
>
> 55. By this time, Biomet misrepresented to Plaintiff Robert Morrison's orthopedic surgeon that the Hip Implant System was safe and effective.
>
> 56. In reliance on these representations, Plaintiff's orthopedic surgeon made the decision to use the Hip Implant System.
>
> 57. If it were not for the misrepresentations made by Biomet, Plaintiff's orthopedic surgeon would not have used the Hip Implant System in Plaintiff's left and/or right hip replacement surgery.
>
> 58. After this second surgery, Plaintiff received physical therapy and rehabilitation services through Gentiva Health Services in Irving, Texas.
>
> 59. As a result of the defective design, manufacture, and composition of the Hip Implant System, and its accompanying warnings and instructions (or lack

thereof), both of Plaintiff Robert Morrison's hip implants failed, causing Plaintiff Robert Morrison severe pain and elevated levels of cobalt and chromium, known as metallosis, resulting in multiple revision surgeries.

60. The metal can destroy the muscle, bone, and tissue surrounding the hip and enter the bloodstream and cause metal poisoning throughout the body.

61. Plaintiff Robert Morrison did not know nor have any reason to know his hip implants were defective or causing him an injury until August 7, 2022 when laboratory tests showed Cobalt levels of 22.1 H and Chromium levels of 18.9 in Plaintiff's blood, which had been caused by a metal-on-metal reaction.

62. Thereafter, he began receiving treatment for the injuries to his hips.

63. On October 14, 2022, Plaintiff Robert Morrison underwent a complex, risky and painful surgery (known as a "revision surgery") to remove the failed metal-on-metal implant from Plaintiff's right hip.

64. On October 17, 2022, Plaintiff Robert Morrison underwent a complex, risky and painful surgery (known as a "revision surgery") to remove the failed metal-on-metal implant from Plaintiff's left hip.

65. After these revision surgeries, Plaintiff received physical therapy and rehabilitation services in Irving, Texas through DPP II, LLC.

66. Revision surgeries are generally more complex than the original hip replacement surgery, often because there is a reduced amount of bone in which to place the new hip implants.

67. Revision surgeries also usually take longer than the original hip replacement surgery and the revision surgery has a higher rate of complications.

68. For example, several studies have found that a revision surgery causes a much higher risk of dislocation compared with an original hip replacement surgery.

69. In one study conducted by Charlotte Phillips and her colleagues at Brigham and Women's Hospital in Boston, 14.4 percent of patients who underwent a revision surgery suffered from a dislocation compared with 3.9 percent of patients who underwent an original hip replacement surgery.

70. In other words, hip replacement patients who have undergone revision surgery are almost four times more likely to suffer from a hip dislocation than those who have not. (Phillips CB, et al.[)]

> 71. Incidence rates of dislocation, pulmonary embolism, and deep infection during the first six months after elective total hip replacement. *American Journal of Bone and Joint Surgery* 2003; 85:20-26.
>
> 72. On December 6, 2022, Plaintiff Robert Morrison dislocated his left hip and was treated by physicians at Medical City Las Colinas in Irving, Texas.
>
> 73. At Medical City, physicians reduced the dislocation and placed Plaintiff's left leg in a cast.
>
> 74. On December 22, 2022, and after suffering three recent left hip dislocations, Plaintiff Robert Morrison underwent another complex, risky and painful surgery (known as a "second revision surgery") performed by Oscar Taunton, M.D. to address the unstable implant in Plaintiff's left hip.
>
> 75. After this second-revision surgery, Plaintiff once again received physical therapy and rehabilitation services in Irving, Texas through All Care Professional Home Health, Inc.
>
> 76. Starting in April 2023, Plaintiff started receiving physical-therapy treatment through Athletico Physical Therapy, located in Coppell, Texas.
>
> 77. On August 17, 2023, Plaintiff underwent a CT scan with metal suppression of his left hip, which revealed a subacute non-displaced acetabular fracture.
>
> 78. In April 2024, Plaintiff underwent an additional CT scan which showed no change in the healing of the bones since the last CT scan.
>
> 79. Plaintiff is currently under the treatment of orthopedic-bone specialist, Dr. Allaaddin Mollabashy, M.D. at Baylor Scott & White in Dallas, Texas.
>
> 80. To this day, Plaintiff continues to receive medical treatment on his hips due to these defective implants.
>
> 81. As a direct and proximate result of the failure of his defective Hip Implant System and Biomet's wrongful conduct, Plaintiff Robert Morrison sustained and continues to suffer economic damages (including lost wages, medical and hospital expenses), severe and possibly permanent injuries, pain, suffering and emotional distress.
>
> 82. As a result, Plaintiff has sustained and will continue to sustain damages in an amount to be proven at trial, but which will far exceed the $75,000.00 jurisdictional amount of this Court.

Doc. 5 ¶¶ 52-82.

Regarding Biomet's Hip Implant System, Plaintiff further alleges that:

> 22. While most hip replacements use a polyethylene plastic acetabular liner, Biomet's Hip Implant System has a critical difference – it is a monoblock system which does not have an acetabular liner.
>
> 23. Instead, the Hip Implant System forces metal to rub against metal with the full weight and pressure of the human body.
>
> 24. Because of Biomet's defective design for the Hip Implant System, hundreds of patients, including Plaintiff Robert Morrison, have been forced to undergo surgeries to replace the failed hip implant.
>
> 25. The Hip Implant System suffers from a design or manufacturing defect that causes excessive amounts of cobalt and chromium to wear and corrode from the surface of the acetabular cup, from the femoral head, and from the taper adapter.
>
> 26. These cobalt and chromium fragments prompt the body to react by rejecting the hip implant.
>
> 27. This rejection often manifests with symptoms of pain, looseness, dislocation, and squeaking and popping sounds. Inside the hip joint, the metal reaction often causes fluids to accumulate and soft tissues and bone to die.

Doc. 5 ¶¶ 22-27.

Mr. Morrison alleges that the Hip Implant System manufactured, designed, sold, distributed, supplied, and/or placed into the stream of commerce by Defendants is defective because it was not adequately tested, and it is defective in its manufacture, construction, and design or formulation. Mr. Morrison further alleges that the Hip Implant System is defective because the character or quality of the system does not conform with Defendants' representations regarding safety and durability of the system, and Defendants failed to warn him regarding unreasonably dangerous risks and reactions associated with the system, including risks like metal poisoning. In addition to his products liability claim (Counts 1-4), he asserts causes of action for negligence (Count 4), breach of express and implied warranty (Counts 6-7), negligent and fraudulent

misrepresentation (Counts 8-9), and fraudulent concealment (Count 10). He seeks to recover compensatory damages, punitive damages, attorney's fees, and costs.

After filing their Answer to Plaintiff's First Amended Complaint on June 13, 2024, Defendants moved on May 15, 2025, for judgment as a matter of law pursuant to Rule 12(c), contending that Texas's fifteen-year statute of repose for product liability claims, Tex. Civ. Prac. & Rem. Code Ann. § 16.012(b), bars all of Plaintiff's claims. Defendants further assert that Plaintiff's claims do not fall within an exception to the statute of repose. Alternatively, Defendants contend that Plaintiff's claims for alleged fraud, failure to warn, and misrepresentations fail because his pleadings do not allege causation or reliance, and his fraud claim is not pleaded with sufficient particularity.

Plaintiff disagrees that his claims are barred and argues that his claims fall under the so-called "latent disease"[1] exception in § 16.012(d). Plaintiff contends that Defendants' willful misconduct or fraudulent concealment bars application of the statute of repose. In addition, he contends that his claims, as pleaded, satisfy the requisite pleading standards. Alternatively, he requests that he be allowed to amend his pleadings.

## II. Defendants' Rule 12(c) Motion (Doc. 18)

As indicated, Defendants move on various grounds for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

### A. Legal Standard

Any party may move for judgment on the pleadings after the pleadings are closed and when it would not delay the trial. Fed. R. Civ. P. 12(c). "Rule 7(a) provides that the pleadings are closed

[1] As herein explained, § 16.012(d) does not use the term "latent disease." It instead it refers only to "disease" without defining the term. Accordingly, the court simply refers to the term "latent disease" in summarizing and discussing the parties' arguments without adopting that term or determining whether it applies here.

upon the filing of a complaint and an answer (absent a court-ordered reply) . . . ." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 at 213 (3d ed. 2004) (footnote omitted). If, however, "a counterclaim, cross-claim, or third-party claim is interposed, . . . the filing of a reply to a counterclaim, crossclaim answer, or third-party answer normally will mark the close of the pleadings." *Id.* (footnote omitted). A "defendant may not move under Rule 12(c) prior to filing an answer." *Id.* at 214.

A motion brought pursuant to Rule 12(c) "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (citation omitted). A court, when ruling on a motion for judgment on the pleadings pursuant to Rule 12(c), applies the same standard as that used for a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) (citation omitted); *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 313 n.8 (5th Cir. 2002) (citation omitted).

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). While a complaint need not contain detailed factual

allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks, citations, and footnote omitted). When the allegations of the pleading do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Likewise, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). In this regard, a document that is part of the record but not referred to in a plaintiff's complaint and not attached to a motion to dismiss may not be considered by the court in ruling on a 12(b)(6) motion. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 & n.9 (5th Cir. 2012) (citation omitted). Further, it is well-established and "'clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.'" *Funk v. Stryker Corp.*, 631

F.3d 777, 783 (5th Cir. 2011) (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).

The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002). While well-pleaded facts of a complaint are to be accepted as true, legal conclusions are not "entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (citation omitted). Further, a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Stated another way:

> A motion to dismiss for failure to state a claim concerns the formal sufficiency of the statement of the claim for relief, not a lawsuit's merits. So when reviewing such a motion, we assume that the facts the complaint alleges are true and view those facts in the light most favorable to the plaintiff. The complaint survives if it contains sufficient factual matter . . . to state a claim to relief that is plausible on its face.

*Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 582 (5th Cir. 2020) (citations and quotation marks omitted). Accordingly, the denial of a 12(b)(6) motion has no bearing as to whether a plaintiff ultimately establishes the necessary proof to prevail on a claim that withstands a 12(b)(6) challenge.

### B. Discussion

#### 1. Texas Statute of Repose for Products Liability Claims

In Texas, products liability claims "have their own statute of repose, a fifteen-year period to which exception is made for products with longer warranties and for products that cause latent

diseases." *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). Under § 16.012(b) of the Texas Civil Practice and Remedies Code, Texas's fifteen-year statute of repose for products liability claims, "a claimant must commence a products liability action against a manufacturer or seller of a product before the end of 15 years after the date of the sale of the product by the defendant." *Camacho v. Ford Motor Co*., 993 F.3d 308, 310 (5th Cir. 2021). The fifteen-year bar under § 16.012(b) is subject to certain exceptions. "The exceptions are for products with a longer express warranty and products that cause a latent disease." *Id.* (citing § 16.012(c), (d), (d-1)). The so-called exception for latent diseases is set forth in § 16.012(d) and (d-1), which state as follows:

> (d) This section does not apply to a products liability action seeking damages for personal injury or wrongful death in which the claimant alleges:
>
> (1) the claimant was exposed to the product that is the subject of the action before the end of 15 years after the date the product was first sold;
>
> (2) the claimant's exposure to the product caused the claimant's disease that is the basis of the action; and
>
> (3) the symptoms of the claimant's disease did not, before the end of 15 years after the date of the first sale of the product by the defendant, manifest themselves to a degree and for a duration that would put a reasonable person on notice that the person suffered some injury.
>
> (d-1) This section does not reduce a limitations period for a cause of action described by Subsection (d) that accrues before the end of the limitations period under this section.

Tex. Civ. Prac. & Rem. Code Ann. § 16.012(d)-(d-1). Thus, to fall within § 16.012(d)'s exception for diseases, a claimant must show: (1) that he or she was exposed to the product within fifteen years of the product's sale; (2) the exposure caused the disease; and (3) the symptoms manifested after fifteen years had elapsed. § 16.012(d)(1)-(3). Section 16.012(e) further provides that "[t]his

section does not extend the limitations period within which a products liability action involving the product may be commenced under any other law."

Defendants assert that Texas's fifteen-year statute of repose for product liability claims bars all of Plaintiff's claims because the statute broadly defines a products liability action "to include *any* claim for damages caused by a defective product, regardless of the underlying legal theory, including strict liability, negligence, misrepresentation, and breach of warranty, or any other theory or combination of theories." Doc. 18 at 8 (citing § 16.012(a)(2)). Defendants further assert that, although Plaintiff does not identify sales dates for the implant devices,[2] the following allegations in his First Amended Complaint reflect that all of his claims fall outside this fifteen-year period:

> The FAC [First Amended Complaint] alleges Plaintiff was implanted with the Biomet hip-replacement devices at issue in this case ("M2a-38") on April 18, 2005 (right hip) and March 6, 2006 (left hip). Doc. 5, FAC, ¶¶ 52, 54. Over 18-years later, he filed the Complaint in this case on April 24, 2024. Doc. 1, Compl. Over 17-years after the implanting surgery, Plaintiff alleges he underwent a right-hip revision surgery on October 14, 2022. Doc. 5, FAC, ¶ 63. Plaintiff also alleges he underwent a left-hip revision surgery on October 17, 2022, over 16-years after the initial implanting surgery. *Id.* ¶ 64. Plaintiff alleges he underwent a second left-hip revision surgery (of a device not at issue in this case) on December 22, 2022. *Id.* ¶ 74.

Doc. 18 at 7. Defendants argue that it is apparent from these pleadings that Plaintiff had implant surgeries in April 2005 (right hip) and March 2006 (left hip), which could have only occurred after

---

[2] In *Camacho v. Ford Motor Co*., 993 F.3d 308 (5th Cir. 2021), the Fifth Circuit considered "how to measure 'the date of the sale of the product by the defendant' under the products-liability statute of repose in § 16.012(b)" and concluded that the language means what it says: "the sale of the product by the defendant." *Id.* at 313. In *Dalfrey*, the Fifth Circuit referred to "the date the product was first sold" as the "date of sale." *Dalfrey v. Boss Hoss Cycles, Inc*., 456 F. App'x 329, 332 (5th Cir. 2011). Although the Texas Supreme Court has not defined "date of sale," the court in *Dalfrey* similarly concluded that "the relevant 'date of sale' under the Texas products liability statute of repose is the date of first sale regardless of whether that sale is to a consumer." *Id.* at 333; *see also Martinez*, No. SA: 14-CV-376-DAE, 2014 WL 6680521, at *4 (W.D. Tex. Nov. 25, 2025) ("As specifically stated in § 16.012(b), the relevant date of sale is the date on which the product was sold *by the defendant*—not the date on which it was purchased by the plaintiff."). The dates of sale are not clear in this case, but the parties do not dispute the use of the 2005 and 2006 hip implant dates themselves as the dates of sale, so the court need not decide this issue in ruling on Defendants' Motion.

the sales dates of the implanted devices, and he did not file suit until April 2024, more than eighteen years later, making his claims untimely as a matter of law.

Plaintiff does not appear to dispute that his claims fall outside Texas's fifteen-year statute of repose period for products liability claims. He instead contends that none of the claims he has asserted in this action are barred because they fall under the "latent disease" exception to the statute of repose. In addition, he contends that Biomet's willful or fraudulent concealment of known risks bars Defendants from invoking the statute of repose. The court, therefore, begins by addressing the exceptions identified by Plaintiff to Texas's statute of repose for product liability claims.

For support that Biomet's alleged engagement in willful or fraudulent concealment of known risks bars them from invoking the statute of repose, Plaintiff relies on *Marshall Independent School District v. U.S. Gypsum Co.*, 790 F. Supp. 1291 (E.D. Tex. 1992) and *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120 (Tex. 1996). As Defendants correctly note, however, these cases analyze the construction statute of repose in section 16.009, not the products liability statute of repose in section 16.012, and Plaintiff does not cite any Texas case applying section 16.009 in a products liability case such as this one. This argument, therefore, does not save Plaintiff's claims from application of the fifteen-year statute of repose under section 16.012.

Plaintiff next contends that his claims fall under the latent disease exception to the Texas statute of repose applicable to product liability claims. While Plaintiff alleges claims for breach of warranty, he does not contend that section 16.012's express warranty exception applies. The court, therefore, considers only whether the exception in § 16.012(d) applies.

Defendants argue that the exception for latent diseases in § 16.012(d) does not apply to alleged medical device failures such as the hip implants at issue in this lawsuit, and Plaintiff does not allege that he experienced any type of disease. Defendant also note that Plaintiff's pleadings

do not even mention the word "disease." Based on two district court cases out of the Eastern District of Tennessee and Southern District of Indiana, Defendants contend that federal courts have rejected attempts to stretch the latent disease exception to cover failed orthopedic implants:

> In *Brown v. Exactech*, [*Inc*., 376 F. Supp. 3d 811 (E.D. Tenn. 2019),] the plaintiff's hip implant fractured nearly 15-years after implantation. [*Id*.] at 814-15. The court held the claim was barred by Texas' Statute of Repose, reasoning that such product failures, even when occurring years after exposure, are not the type of "disease" contemplated by Section 16.012(d). *Id.* at 817. The court explained that latent disease cases typically involve exposure scenarios where injuries are inherently unknowable for a significant time, such as with occupational illnesses or drug side effects. *Id.*
>
> . . . .
>
> The court in *In re Cook Medical, Inc.*, [No. 1:14-ML-2570,] 2023 WL 7548286, at *2-3, [(S.D. Ind. Sept. 27, 2023),] reached the same conclusion on this exact issue applying Texas law. The plaintiff in *Cook* urged the court to interpret the latent disease exception broadly to include medical device failures. The court rejected this argument, holding that "[m]edical device cases are not the prototypical latent injury situation." *Id.* It reaffirmed that latent disease exceptions generally arise in the context of occupational exposure, medical malpractice, or pharmaceutical injuries—not mechanical degradation of implants. *Id.* The court also emphasized that Section 16.012(d) speaks in terms of diseases resulting from "exposure," not wear-and-tear, loosening, or fracture. *Id.*

Doc. 18 at 7-8 (citations omitted).

Defendants further contend that:

> Here, Plaintiff does not allege the delayed onset of a latent disease, as contemplated by Section 16.012(d). He does not claim to have developed a medical condition with hidden or undetectable symptoms that only emerged long after implantation. Instead, he alleges orthopedic injuries that arose from a well-known risk associated with all implanted hip systems: progressive mechanical wear and eventual failure over time. His revision surgeries, imaging results, and ongoing complications stem from the implant's alleged deterioration, not the emergence of a hidden disease caused by exposure to a product.
>
> This distinction is critical. Courts applying Texas law have uniformly held that mechanical failures of implanted devices are not covered by the latent disease exception. *See, e.g., Cook*, 2023 WL 7548286, at *3; *Brown*, 376 F. Supp. 3d at 817; *Hyde* [*v. Hoffman-La Roche Inc*., No. 3:04-CV-1473,] 2008 WL 4191529, at *2-3 [(N.D. Tex. Sept. 10, 2008)]; *Albertson* [*v. T.J. Stevenson & Co., Inc.*, 749

> F.2d 223, 230 (5th Cir. 1984)]. Section 16.012(d) was drafted to address delayed-pathology diseases that evade detection for years, not alleged implant-related injuries that unfold in a predictable manner over time. . . . .
>
> Again, the FAC [First Amended Complaint] contains no allegations related to a disease. Plaintiff alleges he "did not know nor have any reason to know his hip implants were defective or causing him an injury until August 7, 2022," when laboratory tests allegedly revealed elevated cobalt and chromium levels in his blood. Doc. 5, FAC, ¶ 61. But this allegation is readily distinguishable from the latent disease exception. As courts applying Section 16.012(d) have emphasized, the Statute of Repose does not allow claims due to discovery of an injury after the Statute of Repose expires; it requires that the symptoms of a latent disease did not manifest until after the 15-year period. *See, e.g., Hyde*, 2008 WL 4191529, at *2-3. Plaintiff does not allege the emergence of a disease at all, let alone one with hidden or undetectable symptoms. Instead, he identifies a known complication of hip implants: mechanical wear that produces debris, which is detectable through routine monitoring and widely discussed in orthopedic literature.
>
> His lab results in 2022 simply confirmed the devices had deteriorated after many years of use, an injury resulting from device failure (and alleged defects), and not the delayed onset of a latent disease. *See In re Cook*, 2023 WL 7548286, at *3 ("Medical device cases are not the prototypical latent injury situation" and "the plain language of § 16.012(d) establishes the exception does not apply to medical device cases"). Since Section 16.012(d) does not apply to claims based on alleged mechanical failures or implant-related injuries, Plaintiff cannot invoke the latent disease exception.

Doc. 18 at 8-9 (citations omitted).

Defendants assert that the exception in § 16.012(d-1) of the statute is likewise inapplicable here because this section clarifies that it "does not reduce a limitations period for a cause of action described by Subsection (d) that accrues before the end of the limitations period under this section." Defendants, thus, contend that, because § 16.012(d-1)'s latent disease exception "does not apply . . . , and Plaintiff's causes of action accrued more than fifteen-years after Biomet allegedly sold the product at issue," Plaintiff cannot rely on § 16.012(d-1). Doc. 18 at 9-10. Defendants, therefore, argue that Texas's statute of repose is "an absolute bar to all Plaintiff's claims," which should be dismissed with prejudice. *Id.* at 10.

Plaintiff counters that the allegations in his First Amended Complaint fall squarely within § 16.012(d) because they support a finding that he suffered from metal ion disease or metallosis, which he asserts is "the systematic accumulation of toxic metal ions in the body causing tissue death, organ damage, and systemic poisoning" and constitutes a disease "under any reasonable medical or legal definition." Doc. 22 at 9-10.[3] For support that metallosis qualifies as a disease, he cites a medical article—The Mechanism of Metallosis After Total Hip Arthroplasty—located on the National Center for Biotechnology Information's National Library of Medicine website. *See id*. To show that metallosis qualifies by analogy as a latent disease under § 16.012(d), he references latent disease cases involving "inherently discoverable" symptoms.[4] Plaintiff contends that, like these cases, the allegations in his First Amended Complaint indicate that he did not know, and he had no reason to know that "he was slowly being poisoned with cobalt and chromium until he received his blood test results over 16 years later." Doc. 22 at 11.

Plaintiff argues that Biomet's "mechanical failure" argument is legally and factually flawed. Specifically, Plaintiff contends that Biomet's argument—that "[h]is revision surgeries, imaging results, and ongoing complications stem from the implant's alleged deterioration, not the emergence of a hidden disease caused by exposure to a product"—result in the "unconscionable conclusion that deliberately exposing consumers to toxic metal poisoning through chromium and cobalt represents nothing more than ordinary product wear." Doc. 22 at 12. According to Plaintiff, such a characterization "defies both legal precedent and common sense" and would create a

[3] For support, he cites an article located at https://pmc.ncbi.nlm.nih.gov/articles/PMC9075182/. As the court is limited to the pleadings in ruling on Defendants' Rule 12(c) Motion and sees no reason to convert Defendants' Rule 12(c) Motion to one for summary judgment, it cannot consider matters such as this article that are outside the pleadings.

[4] Doc. 22 at 10-11 (citing *Schlumberger Tech. Corp. v. Pasko*, 544 S.W.3d 830 (Tex. 2018); *Childs v. Haussecker*, 974 S.W.2d 31 (Tex. 1998); *Latouche v. Perry Homes, LLC*, 606 S.W.3d 878, 881, 2020 WL 3967962 (Tex. App.—Houston [14th Dist.] 2020, pet. denied); and *Burke v. Union Pacific Res. Co.*, 138 S.W.3d 46 (Tex. App.—Texarkana 2004, pet. denied).

dangerous precedent that would allow manufacturers to escape liability for deliberately concealing toxicological processes by reframing them as ordinary product aging. *Id.* at 12 & 14. Plaintiff further asserts that *Brown v. Exactech, Inc.* and *In re Cook Medical, Inc.* are factually distinguishable because they involved immediate pain or acute traumatic injuries as opposed to latent injuries involving symptoms that developed over time and, in any event, the cases are not binding authority.

Biomet replies that, while the cases it relies on may not be binding authority, they are persuasive in that they involve medical device implants and latent disease exceptions to statutes of repose applicable to products liability claims, whereas the cases that Plaintiff relies on do not and instead involve the application of the common-law discovery rule to the statute of limitations. Additionally, Biomet contends that, unlike the case primarily relied on by Plaintiff—*Childs v. Haussecker*—that involved occupational lung disease (silicosis) that arose from decades of exposure such that it was impossible to identify a particular exposure as the first injury, "metallosis from a MoM hip implant is an individual injury allegedly linked to the implantation of specific MoM devices on identifiable dates." Doc. 24 at 5. Biomet thus argues that metallosis "is not a disease (or latent)" because it "is easily detectable through (among other methods) blood testing" as Plaintiff alleges in his pleadings. *Id.* (citing Doc. 3 ¶ 61).

The issue presented and hotly contested by the parties is whether metallosis qualifies as a disease. Section 16.012(d), however, does not define "disease," and the Texas Supreme Court has not interpreted § 16.012(d) or defined "disease." Additionally, although both parties use the term "latent disease," § 16.012(d) does not use this term. Both parties cite the Texas Supreme Court's opinion in *Galbraith Engineering Consultants v. Pochucha*, 290 S.W.3d 863 (Tex. 2009), which states that "products claims now have their own statute of repose, a fifteen-year period to which

exception is made for products with longer warranties and for products that cause ***latent diseases***." *Id*. at 867 (emphasis added). This statement, though, was simply made in passing and, in any event, does not resolve the issues presented in this case.

Absent a final decision by the Texas Supreme Court that "precisely resolves the legal issue" here as to how it would define "disease" for purposes of whether § 16.012(d), the court must make an "*Erie* guess"[5] and determine "what the Supreme Court of Texas would decide" based on "the sources of law that the state's highest court would look to, including intermediate state appellate court decisions, the general rule on the issue, decisions from other jurisdictions, and general policy concerns." *Martinez v. Walgreen Co*., 935 F.3d 396, 398 (5th Cir. 2019) (citation omitted). Although the passing reference to "latent disease" in *Galbraith* may be dicta, the court is not precluded from considering it because, as the Fifth Circuit has explained:

> "In making our *Erie* guess, we look first to those Texas Supreme Court cases that, while not deciding the issue, provide guidance as to how the Texas Supreme Court would decide the question before us." *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 564 (5th Cir. 2010). "Though the decisions and dicta of the Texas Supreme Court weigh more heavily in our *Erie* analysis, we also consider those decisions of Texas appellate courts in determining how the Texas Supreme Court would rule on this issue." *Id.* at 566.

*Marfil v. City of New Braunfels, Tex*., 178 F.4th 941, 947 (5th Cir. 2026). When making an *Erie* guess, though, federal courts in this Circuit do not have authority to "adopt innovative theories of state law but aim simply to apply that law as it currently exists." *Id.* (quoting *Weatherly v. Pershing, LLC*, 945 F.3d 915, 920 (5th Cir. 2019)). Thus, "[i]f the law of the state is to be changed, it is up to the supreme court of the state and not [federal courts in this Circuit] to change the substantive law of that state." *Id.* (quoting *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 765 n.5 (5th Cir. 2018)).

[5] *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

Consideration of *Galbraith*'s use of the term "latent disease" in referencing § 16.012(d) together with the language in subsection (d)(3)—"the symptoms of the claimant's disease did not, before the end of 15 years . . . manifest themselves to a degree and for a duration that would put a reasonable person on notice that the person suffered some injury"—indicate that the Texas legislature may have intended and the Texas Supreme Court would interpret the exception in § 16.012(d) to apply to diseases often referred to as "latent diseases," even though that term is not used in the statute. Even so, this does not end the court's analysis because the parties do not cite, and the court was unable to find, any Texas appellate court opinions that address the precise issues in this case or whether any type of disease and related injury resulting from implanted medical devices could ever fall within the § 16.012(d)'s exception for diseases. **Both parties correctly identify the shortcomings in the other sides' legal authority, but neither side adequately briefs the issues the court must decide in conducting an *Erie* analysis.**

Moreover, the court has concerns regarding the legal authority relied on by Defendants. In addition to the distinguishing factors noted by Plaintiff, all of the statute of repose cases cited by Defendants, except for two, involved summary judgments rather than Rule 12(b)(6) motions to dismiss or Rule 12(c) motions for judgment on the pleadings. *See Albertson*, 749 F.2d at 226; *Brown*, 376 F. Supp. 3d at 813; *Hyde*, 2008 WL 4191529, at *1. Moreover, *Albertson* involved a federal statute of repose, and this and the other cases turned on evidence, sometimes medical in nature, of the type of injury involved; when the plaintiff was exposed to a product; when the plaintiff began to experience symptoms; and when the plaintiff discovered or realized that the symptoms or injury were caused by the product.

Here, Plaintiff alleges that he "did not know nor have any reason to know his hip implants were defective or causing him injury until August 7, 2022," when laboratory tests showed high

levels of metal substances in his blood, which he alleges were "caused by a metal-on-metal reaction" from the hip implants. Doc. 5 ¶ 61. While Plaintiff alleges his injuries were caused by failure of his defective hip implants, he also alleges that the hip replacements were defective because they caused metal fragments to be released into his bloodstream, and it was this metal poisoning or metallosis that necessitated multiple revision surgeries because the metal destroyed the muscle, bone, and tissue surrounding his hips. Plaintiff does not use the term "disease" in his pleadings; however, he attributes his injuries to metallosis and alleges that the metal poisoning and related injuries he suffered occurred as a result of the defective design of the hip implants in using metal-on-metal. These allegations satisfy § 16.012(d)'s requirements such that the only issues that remain to be decided are whether metallosis qualifies as a "disease" and whether the Texas Legislature intended § 16.012(d)'s disease exception to apply to medical device implants.

Biomet asserts that the cases it relies on stand for the per se rule that metallosis does not qualify as a latent disease, and that plaintiffs who suffer injuries from medical device implant failures can never rely on § 16.012(d)'s disease exception, even if they allege that their injuries stem from metallosis that was caused by the release over time of metal particles such as cobalt and chromium from the metal-on-metal hip implants rather than a single exposure to the implant on the date of the implant. Biomet contends that the exact argument made by Plaintiff "under the latent disease exception has been consistently rejected by federal courts analyzing a statute of repose's application to metal-on-metal("MoM") hip replacement devices allegedly causing metallosis." Doc. 24 at 1. In this regard, Biomet first argues that "federal courts have . . . [held that] there is a single causation agent and event in cases alleging metallosis—implanting [of the] MoM hip devices"—such that metallosis does not qualify as a latent disease because symptoms such as "hip weakness, pseudotumor, metallosis, and other symptoms [are] all readily identifiable,

discrete physical injuries" whereas "the latent disease exception is typically 'limited to diseases that develop over long periods of time after multiple exposures to offending substances which are thought to be causative agents, [and] where it is impossible to identify any particular exposure as the first injury.'" Doc. 24 at 1 (quoting *Nester v. Biomet, Inc.*, No. 22-CV-1362, 2024 WL 4003100, at *13 (E.D. Wis. Aug. 30, 2024); and *DeVito v. Biomet, Inc.*, No. 5:23-CV-00185, 2024 WL 1289805, at *4 (E.D.N.C. Mar. 26, 2024)). Biomet contends that federal courts have concluded that metallosis is not a disease for similar reasons—because the authorities cited by the district court in *Nester* "generally hold symptoms or physical injuries induced by a medical implant are not latent diseases, as they are individual phenomena linked to one cause—the implantation of the device—as opposed to a progressive disease lying in wait." Doc. 24 at 2 (quoting *Nester*, 2024 WL 4003100, at *13).

*Nester* is not binding or persuasive, as it involved a summary judgment motion and expert medical testimony regarding the nature of the plaintiff's symptoms, injury, and the facts surrounding the date the injury was discovered. In concluding that metallosis does not qualify as a latent disease, the federal district court in *Nester* applied the Wisconsin statute of repose, which unlike the Texas statute of repose includes an express exception for "latent disease[s]." See *Nester*, 2024 WL 4003100, at *13 (citing Wis. Stat. § 895.047(5)). Because the Wisconsin statute does not define "latent disease," the district court in *Nester* recognized that it was required to do an *Erie* analysis, but, instead of doing an *Erie* analysis to determine what the Wisconsin Supreme Court would decide, it simply relied on the Southern District of Indiana's analysis in *In re Cook Medical*, which involved Texas's statute of repose for product liability claims.

*DeVito*, the other case cited in Defendants' reply brief, involved a motion to dismiss under Rule 12(b)(6), but it turned on the North Carolina Supreme Court's definition of latent disease in

*Wilder v. Amatex Corporation*, S.E. 2d 66 (1985). *See DeVito*, 2024 WL 1289805, at *3-4. Specifically, the district court in *DeVito* noted that *Wilder* distinguished:

> "[d]iseases . . . [that] normally develop over long periods of time after multiple exposures to offending substances which are thought to be causative agents[ ]" from injuries where "it [is] possible to identify a single point in time when plaintiff was first injured." . . . The key distinction is that with diseases "[i]t is impossible to identify any particular exposure as the first injury."

*DeVito*, 2024 WL 1289805, at *3 (quoting *Wilder*, 336 S.E. 2d at 76). The court in *DeVito* went on to explain that "[t]he difficulty with '[d]iseases such as asbestosis, silicosis, and chronic obstructive lung disease[,]' is that it is difficult to pinpoint or establish that the disease was caused by a product because 'one or even multiple exposures to an offending substance . . . may not constitute an injury.'" *Id.* at *3 (quoting *Wilder*, 336 S.E. 2d at 76) (citing *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1083 (5th Cir. 1973), for the conclusion that it is difficult to identify which exposure to asbestos dust caused asbestosis because the disease is the cumulative result of many exposures to asbestos dust).

Even applying this definition, Mr. Morris does not appear to allege that he was injured or experienced any symptoms on the dates he received his hip implants or soon after; rather, he alleges that over a period of years, during which time he had no symptoms, he was exposed to metal fragments from the implants that gave rise to elevated metal levels in his bloodstream (metallosis) that eventually caused the deterioration of not only the hip implant but also the tissue surrounding his hip that made later him implant revisions or replacements difficult and made him more susceptible over time to an eventual hip dislocation that occurred in December 2022. In other words, Mr. Morrison does not allege his injuries can be linked to one point in time or cause—the date of his implantation of the MoM hip implant devices or normal wear and tear of the devices. He instead alleges that he had no immediate symptoms after his implant surgeries, and it was not

until August 7, 2022, that laboratory tests showed he had high levels of cobalt and chromium. Doc. 5 ¶ 61. Because he alleges that he had no prior symptoms, the court can plausibly infer from this and the other allegations in his First Amended Complaint that the alleged metal poisoning or metallosis occurred over many years as metal cobalt and chromium fragments from the hip implants were released as metal in the devices rubbed against metal with the full weight and pressure of his body. *See id.* ¶¶ 14, 25, 26, 27, 59, 60. The court can also plausibly infer that Mr. Morrison is not certain when the exposure to the metal particles began or at what point in time his injuries occurred as a result of the exposure to the metal fragments over the years.

Thus, as pleaded, Plaintiff's allegations fit the definition of latent disease in *Wilder* as followed by *DeVito* and *Nester*, even though the courts in these cases and other cases cited by Defendants reasoned that medical implant injuries do not *typically* fall into the categories of diseases or cases that *generally* involve latent injuries. Accordingly, the reasoning in these cases, including the following reasoning *In re Cook Medical*, which involved a Rule 12(c) motion and § 16.012(d)'s disease exception, are not persuasive:

> Plaintiff asks the court to interpret the term "disease" broadly to include medical device failures. But "[m]edical device cases are not the ***prototypical*** latent injury situation." *Brown v. Exactech, Inc.*, 376 F. Supp. 3d 811, 817 (E.D. Tenn. 2019) (applying Texas law). Latent injury (or disease) cases ***typically*** arise in one of three situations: "occupational disease, medical malpractice, and pharmaceutical side effects." *Id.*; *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 230 (5th Cir. 1984).

*In re Cook Medical, Inc.*, 2023 WL 7548286, at *2 (footnote omitted and emphasis added). In addition, *In re Cook Medical* is distinguishable because the district court in that case noted that the plaintiff's pleadings did not "explain how her device failed and caused her injury." *Id.* at n.3.

Defendants also rely on the district courts' reasoning in both *Brown* and *In re Cook Medical* that injuries from medical device implants do not fall within § 16.012(d)'s disease exception

because this section "does not mention medical devices or the type of injuries that ordinarily arise from them," and applying § 16.012(d)'s exception to them "would effectively create a 'medical device exception' for an otherwise strict statute of repose," although "[t]here is no evidence the Texas legislature intended this outcome." *Brown*, 376 F. Supp. 3d at 819; *In re Cook Medical, Inc.*, 2023 WL 7548286, at *2 (citation omitted).

While section 16.012(d) does not reference metallosis, it does not specifically reference any other particular disease by name either. Moreover, the court disagrees that recognizing metallosis as a disease or latent disease for purposes of § 16.012(d)'s exception would open the floodgates to all claims for defective or failed implant devices, as the exception would still be limited to cases that satisfy the statutory requirements in which a plaintiff alleges: (1) exposure to a product "before the end of 15 years after the date the product was first sold"; (2) that the exposure to the product caused the plaintiff's disease; and (3) that the symptoms of the disease did not, before the end of the 15 years, "manifest themselves to a degree and for a duration that would put a reasonable person on notice that the person suffered some injury." Tex. Civ. Prac. & Rem. Code Ann. § 16.012(d). The court, therefore, determines that the reasoning in the cases relied on by Defendants is not a valid reason for dismissing Mr. Morrison's failure to warn claim *at this juncture*, especially given the inadequacy of their briefing on the issues that the court must decide in the context of an *Erie* analysis. Further, as Plaintiff does not appear to rely on § 16.012(d-1), the court need not address Defendants' arguments regarding the applicability of this exception to Texas's statute of repose.

**2. Plaintiff's Constitutional and Policy Arguments**

Plaintiff also contends that Defendants' latent disease argument should be rejected for constitutional and policy reasons because it would be unjust to bar claims before a plaintiff

discovers his or her injuries. Based on the limited research conducted by the court regarding these issues, it questions whether these arguments would allow Mr. Morrison to avoid Texas's fifteen-year statute of repose for product liability claims. The court, however, need not address in detail these arguments in light of its determination that the issue of whether § 16.012(d)'s disease exception applies to his claims should be decided at the summary judgment state of this litigation or trial.

**3. Defendants' Alternative Ground for Dismissal**

In the alternative, Defendants argue that Plaintiff's fraud, failure to warn, and misrepresentation claims should be dismissed for other reasons.

**a. Causation and Reliance for Fraud and Failure to Warn Claims**

Defendants first argue that Plaintiff's First Amended Complaint fails to adequately allege causation or reliance:

> Plaintiff's fraud and misrepresentation theories overlap with his failure to warn allegations and are premised on the notion that Biomet misrepresented the safety of the M2a-38 and failed to adequately disclose risks to physicians and patients. But Plaintiff does not identify any specific warnings that were provided to his implanting physicians, nor does he allege how those warnings were deficient. Plaintiff also fails to allege a different warning would have changed the decision of his implanting physicians to recommend or use the M2a-38.
>
> Courts applying Texas law routinely dismiss such conclusory pleadings in failure to warn, fraud, and misrepresentation cases involving medical devices. *See, e.g.*, *Marrufo v. Ethicon, Inc.*, No. DR-20-CV-00043-AM, 2020 WL 7680562, at *3 (W.D. Tex. Nov. 20, 2020) (dismissing claims where plaintiff failed to identify what warnings her doctor received, how they were inadequate, or how different warnings would have changed the outcome); *Gonzalez v. Bayer Healthcare Pharms., Inc.*, 930 F. Supp. 2d 808, 818 (S.D. Tex. 2013); *Fearrington v. Boston Sci. Corp.*, 410 F. Supp. 3d 794, 801-02 (S.D. Tex. 2019).

Doc. 18 at 10.

For claims based on failure to warn and marketing defects, a plaintiff must allege that: (1) "the warning was defective"; and (2) the defect "was a producing cause of the [plaintiff's] injury."

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Product Liability Litigation*, 888 F.3d at 772 (quoting *Ackermann v. Wyeth Pharm*., 526 F.3d 203, 208 (5th Cir. 2008)). Texas's learned intermediary doctrine applies in failure-to-warn cases in which it is undisputed that the plaintiff received the manufacturer's warning regarding the risks associated with the product through a treating physician. *Centocor*, *Inc. v. Hamilton*, 372 S.W.3d 140, 165 (Tex. 2012). Under this doctrine, which applies to "medical products liability actions" in Texas, "the manufacturer . . . satisfies its duty to warn the end user of its product's potential risks by providing an adequate warning to a 'learned intermediary,' who then assumes the duty to pass on the necessary warnings to the end user." *In re DePuy Orthopaedics, Inc.*, 888 F.3d at 774 (quoting *Centocor*, *Inc.*, 372 S.W.3d at 142).

In *Centocor*, the Texas Supreme Court explained that:

> When the learned intermediary doctrine is asserted in a cause of action, it is used to show to whom a defendant, usually a prescription drug manufacturer, owes the duty to adequately warn. ***It is not used to show that the plaintiff has no valid case. Even when the learned intermediary doctrine applies, the manufacturer still has a duty to warn, and it can still be held liable directly to the plaintiff if the warning that it gave is inadequate.***

*Id.* at 165 (quoting *Wyeth-Ayerst Labs. Co. v. Medrano*, 28 S.W.3d 87, 93-94 (Tex. App.—Texarkana 2000, no pet.) (emphasis added)). Accordingly, once a defendant manufacturer "invoke[s] the learned intermediary doctrine," a plaintiff must allege and ultimately has the burden of proving that: (1) the manufacturer's "product warning was inadequate," *id.* at 166; and (2) "but for the inadequate warning," the plaintiff's "doctors would have recommended different treatment, *see Ackermann*, 526 F.3d at 208, 214, or provided additional warnings that would have led [the] plaintiff[] to withhold consent[.]" *In re DePuy Orthopaedics, Inc.*, 888 F.3d at 775 (citing *McNeil v. Wyeth*, 462 F.3d 364, 373 (5th Cir. 2006) (footnote omitted)). "The issue is generally a fact question, but "[w]hen the prescribing physician is aware of the product's risks and decides to use

it anyway, any inadequacy [in] the product's warning, as a matter of law, is not the producing cause of the patient's injuries." *Id.* (quoting *Centocor*, 372 S.W.3d at 170).

Here, Plaintiff alleges as follows in his First Amended Complaint:

> 112. The Hip Implant System was defective and unreasonably dangerous when it left the possession of the Defendants in that it contained warnings insufficient to alert consumers, including Plaintiff Robert Morrison, of the dangerous risks and reactions associated with the Hip Implant System, including but not limited to, the risks of developing serious and dangerous side effects, component loosening, component mal-alignment, infections, fracture of the bone, dislocation, metal sensitivity and pain, irritation and discomfort, as well as the need for additional procedures to remove and replace the Hip Implant System, as well as other severe and permanent health consequences notwithstanding the Defendants' knowledge of an increased risk of these injuries and side effects over other hip arthroplasty devices.
>
> 113. At the time of Plaintiff's receipt and/or use of the Hip Implant System, the Hip Implant System was being used for the purposes and in a manner normally intended, namely for hip arthroplasty.
>
> 114. Plaintiff Robert Morrison could not, by the exercise of reasonable care, have discovered the defects mentioned herein and perceived their danger.
>
> 115. Defendants, as manufacture[r]s and/or distributors of the Hip Implant System, are held to the level of knowledge of an expert in the field.
>
> 116. The warnings that were given by the Defendants were not accurate, clear, and/or were ambiguous.
>
> 117. The warnings that were given by the Defendants failed to properly warn physicians of the increased risks, subjecting Plaintiff Robert Morrison to risks that exceeded the benefits of the Hip Implant System, including but not limited to, component loosening, component mal-alignment, infections, fracture of the bone, dislocation, metal sensitivity, irritation and discomfort, as well as the need for additional procedures to remove and replace the Hip Implant System, as well as other severe and permanent health consequences, notwithstanding the Defendants' knowledge of an increased risk of these injuries of side effects over other hip arthroplasty devices.
>
> 118. Plaintiff Robert Morrison, individually and through Plaintiff's physicians, reasonably relied upon the skill, superior knowledge, and judgment of the Defendants.

> 119. Defendants had a continuing duty to warn Plaintiff Robert Morrison of the dangers associated with the Hip Implant System.
>
> 120. Had Plaintiff Robert Morrison received adequate warnings regarding the risks of the Hip Implant System, Plaintiff would not have used it.
>
> 121. As a direct and proximate result of Plaintiff Robert Morrison's use of the Hip Implant System, and Plaintiff's reliance on Defendants' representations regarding the character and quality of the Hip Implant System, and/or the failure to comply with federal requirements, Plaintiff Robert Morrison suffered serious physical injury, harm, damages and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

Doc. 1 ¶¶ 112-121.

The foregoing allegations in paragraphs 112 through 121 of the First Amended Complaint are sufficient to satisfy the requirement that Plaintiff allege that Biomet's "warning was defective." *See In re DePuy Orthopaedics, Inc.*, 888 F.3d at 772 (quoting *Ackermann*, 526 F.3d at 208). While it is unclear from these allegations whether Plaintiff relied on a warning regarding the risks of the Hip Implant System that he received from Biomet or his treating doctors, the court determines that his allegations are sufficient at this stage of the litigation to adequately plead the second requirement—that the defect in Biomet's Hip Implant System "was a producing cause of [his] injury." *See id.* Whether Plaintiff received notice of the warning from Biomet, his doctors, or both can be addressed during discovery. To the extent the district court cases relied on by Defendants require more specificity *at the pleading state*, the court declines to follow the opinions in those cases, which, in any event, are not binding on the undersigned. [6]

[6] The district courts in *Fearrington* and *Marrufo* accurately set forth the elements of a claim based on a failure to warn claim when the learned intermediary doctrine applies: "[U]nder the learned intermediary doctrine, a plaintiff must 'plead facts that would show her doctors were inadequately warned and but for those inadequacies her doctors would have recommended different treatment or given [her] [or him] counsel that would have led [her] to withhold consent." *Marrufo*, 2020 WL 7680562, at *3 (quoting *Fearrington*, 410 F. Supp. 3d at 801) (citing *In re DePuy Orthopaedics, Inc*., 888 F.3d at 775). Based on the district court's opinion in *Gonzalez*, however, *Fearrington* and *Marrufo* go on to conclude that, to satisfy these requirements, a plaintiff must identify by name his or her doctor, identify the precise warning the doctor received from the manufacturer, and "demonstrate" that a different warning would have changed the doctor's actions. *Fearrington*, 410 F. Supp. 3d at 802) (citing *Gonzalez*, 930 F. Supp. 2d at 818); *Marrufo*, 2020 WL 7680562, at *3) (citing *Gonzalez*, 930 F. Supp. 2d at 818). *Gonzalez* in turn relied on the Fifth Circuit's opinion

**b. Application of Rule 9(b) to Fraud Claim**

Defendants next argue that Plaintiff's fraud claim, as pleaded in his First Amended Complaint does not meet Rule 9(b)'s particularity requirement.

As indicated, "Rule 9(b) applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not." *Lone Star Ladies Inv. Club*, 238 F.3d at 368. Rule 9(b), therefore, applies to Plaintiff's fraud claim. "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp*., 343 F.3d 719, 724 (5th Cir. 2003) (citation omitted). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' [of the fraud] to be laid out." *Id.* (quoting *Williams v. WMX Techs., Inc*., 112 F.3d 175, 177 (5th Cir. 1997)).

---

in *Pustejovsky v. Pliva, Incorporated*, 623 F.3d 271 (5th Cir. 2010), in reaching this conclusion. *Pustejovsky*, however, is a summary judgment case, whereas at the pleading stage, a plaintiff is not required to "demonstrate" or prove anything. Additionally, neither *Pustejovsky* nor any binding opinion that the court was able find has held that the specificity required by *Fearrington* and *Gonzalez*—in identifying the name of the plaintiff's doctor and the precise warning received by the doctor—is necessary *at the pleading stage* to satisfy the two elements identified by the Fifth Circuit that a warning was defective, and the defective warning was a producing cause of the plaintiff's injury. Further, although the Fifth Circuit has held—that "Rule 9(b) applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not," *Lone Star Ladies Inv. Club v. Schlotzsky's Inc*., 238 F.3d 363, 368 (5th Cir. 2001)—and Defendants assert that "Plaintiff's fraud and misrepresentation theories overlap with his failure to warn allegations," they do not argue that Federal Rule of Civil Procedure 9(b)'s pleading particularity requirements apply to his failure to warn claims, and Plaintiff does not appear to allege that that Biomet's failure to warn was fraudulent. Defendants instead only argue that Plaintiff's fraud claim is subject to Rule 9(b). Finally, by arguing that—"He does not allege, for example, that his surgeon was unaware of the known risks of the M2a-38, relied on any specific representations by Biomet, or would have acted differently had a different warning been provided. Absent such facts, Plaintiff cannot establish causation under Texas' learned intermediary doctrine"—it appears, but it is not entirely clear from Defendants' Motion whether they are "invok[ing" the learned intermediary doctrine in this case to reflect that they provided Plaintiff's doctors with warnings regarding Biomet's Hip Implant System. As noted, it is also not entirely clear from Plaintiff's pleadings whether he relied on a warning from his doctors, Biomet, or both. Even assuming the learned intermediary doctrine applies in this case, the court determines that the allegations in Plaintiff's First Amended Complaint are sufficient and notes that, in a case involving similar allegations, a district judge in this District rejected an argument akin to the one made here by Defendants. *See Langston v. Ethicon Inc*., No. 3:20-CV-3712-S, 2021 WL 6198218, at *5 (N.D. Tex. Dec. 31, 2021) (denying motion to dismiss the plaintiff's failure to warn claim and argument that dismissal was warranted because the plaintiff's complaint "does not contain sufficient facts identifying the materials received and reviewed by Plaintiff's doctor or demonstrating that her doctor would not have implanted the device had additional warnings been given.").

Defendants contend that Plaintiff's pleadings fail to meet this standard because he "does not identify who made the allegedly fraudulent statements, when or where those statements were made, or what specific representations were false," and "[h]e also fails to identify any specific written or oral communication directed at his implanting physicians that was relied upon in selecting the M2a-38." Doc. 18 at 12.

The court agrees that Plaintiff's fraud claim, as currently pleaded, does not satisfy Rule 9(b) because the First Amended Complaint does not identify the person or persons "who" made the alleged misrepresentations or concealed the material information; nor does it specify each Defendants' role with respect to the purported fraud. Although Plaintiff contends that he identifies "Biomet" as the entities that made the alleged misrepresentations through their corporate representatives and marketing materials, and he asserts that "courts have recognized that this level of specificity is sufficient whe[n] the defendant is a corporation," the case he cites does not support this conclusion, and the undersigned was unable to find any case in which the Fifth Circuit that has held that less specificity is required in identifying the "who" when the plaintiff has asserted a common law fraud claim against a defendant that is a corporate entity. *See* Doc. 22 at 20 (citing *Tuchman v. DSC Commc'ns Corp*., 14 F.3d 1061, 1068 (5th Cir. 1994)).

The court, however, determines that Plaintiff's pleadings are otherwise adequate to satisfy Rule 9(b)'s remaining requirements. While Plaintiff has previously amended his pleadings once before Defendants moved for judgment on the pleadings, he did not have the benefit of the court's ruling on that Motion, and it is unclear whether allowing him to replead this claim would be futile. The court will, therefore, allow him to replead this claim.

**III. Plaintiff's Motion for Leave to File Surreply (Doc. 25)**

Plaintiff seeks leave to file a surreply before the court rules on Defendants' Motion, contending that Defendants raised new arguments and cite new case law in their reply brief.

This court has previously explained that, once a motion is filed, this District's Local Civil Rules permit a response by the nonmovant and a reply by the movant. *See* Local Civil Rule 7.1. Thus, the movant is entitled to file the last pleading. Surreplies, and any other filing that serves the purpose or has the effect of a surreply, are highly disfavored and must not to be filed as a routine matter, as they usually are a strategic effort by the nonmovant to have the last word on a matter beyond that permitted and contemplated by this district's Local Civil Rules. *Bailey v. Mansfield Indep. Sch. Dist*., No. 3:18-CV-1161-L, 2019 WL 175088, at *2 (N.D. Tex. Jan. 10, 2019). In addition, the court has found that surreplies usually are not that helpful in resolving pending matters, as they tend to repeat prior arguments and only serve to unnecessarily delay the resolution of the underlying motion. The undersigned, therefore, only allows filings beyond that permitted by Local Civil Rule 7.1 in exceptional or extraordinary circumstances. *See PMA Ins. Grp. v. Polk Mech. Co., LLC*, No. 3:23-CV-610-L, 2024 WL 3974736, at *2 (N.D. Tex., Aug. 27, 2024) (citing *Gezu v. Charter Comm'ns*, 17 F.4th 547, 556 (5th Cir. 2021) ("Because the rules do not provide for surreplies as a matter of right, the district court only accepts such filings 'in exceptional or extraordinary circumstances.'"). This District is not alone in its treatment of surreplies. *See PMA Ins. Grp.*, 2024 WL 3974736, at *2 (citing *Weems v. Hodnett*, No. 10-CV-1452, 2011 WL 2731263, at *1 (W.D. La. July 13, 2011) (citing cases)).

To establish that exceptional or extraordinary circumstances warranting a surreply exist, a party seeking leave to file a surreply ordinarily must show that a new issue, theory, argument, or evidence was raised or relied on for the first time in the movant's reply brief or in connection with

the reply brief. *Id.*; *see also Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (holding that "the district court did not abuse its discretion" in denying Plaintiff's motion to file a surreply "because [Defendant] did not raise any new arguments in its reply brief"). Such circumstances arise infrequently, as the scope of a reply is limited to addressing arguments raised in the movant's initial motion and brief and the scope of the arguments contained in the response because it would be unfair for the movant "to sandbag and raise wholly new issues in a reply." *PMA Ins. Grp.*, 2024 WL 3974736, at *2 (citing *Weems*, 2011 WL 2731263, at *10); *Campoamor v. Cengage Learning, Inc.*, No. 3:09-CV-0921-M, 2010 WL 11618843, at *1 (N.D. Tex. June 10, 2010). For similar reasons, "arguments raised for the first time in a Reply brief are [generally] waived." *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) (citation omitted).

Here, the court determines that the legal arguments and case citations in Defendants' reply are related to arguments raised in their initial Motion and/or fall within the scope of the arguments in Plaintiff's response to the Motion. Accordingly, Plaintiff has not established the exceptional or extraordinary circumstances necessary to warrant a surreply under the circumstances. In any event, Plaintiff's request for leave to file a surreply to Defendants' Motion is mooted by the court's rulings regarding Defendants' Motion. Plaintiff's Motion for Leave will, therefore, be denied as moot.

## IV. Conclusion

For the reasons stated, Defendants' Motion is **denied without prejudice** with respect to Plaintiff's fraud claim, and denied with respect to Defendants' remaining arguments. In light of the court's rulings on Defendants' Motion, the court also **denies as moot** Plaintiff's Motion for Leave to File Surreply (Doc. 25). Plaintiff shall file an amended complaint by **September 23, 2026**, that addresses the deficiencies identified in this memorandum opinion and order. *Failure of*

*Plaintiff to do so will result in the dismissal with prejudice of Plaintiff's fraud claim (Count 9) under Rule 12(c).*

**It is so ordered** this 2nd day of September, 2026.

Sam A. Lindsay
United States District Judge